17-6221 PGP LLC versus TPII LLC at all. Arguments not to exceed 15 minutes per side. Mr. Masters for the appellant. May it please the Court, Your Honors, Counsel. Douglas Masters on behalf of the plaintiff appellant. I've reserved four minutes for rebuttal. Your Honor, we're asking that this Court reverse the denial of the preliminary injunction because the district court applied settled law unlikely to confusion and error. As we'll discuss, the ruling to our understanding is really unprecedented. We're not aware of any other ruling on these facts that has denied a preliminary injunction. Effectively, what the Court ruled is that the owner of a registered mark cannot stop an exclusive licensee who continues to use that same mark for the same services after the expiration of the license until it finds a new licensee and begins to compete with that former licensee in the marketplace. I'd like to start with the standard of review because I think that's important here. As Your Honors presumably know, preliminary injunctions are reviewed for an abuse of discretion standard. Here, we're not challenging the facts. The appellee has not cross-appealed. As far as we know, there's no challenge to the facts. The facts are accurate. What we're arguing is that the Court misapplied the law, and that constitutes an abuse of discretion. In determining the likelihood of success and the merits, this Court Can I ask, when you submitted your application, or not you but your client, for the trademark and service mark apps, your client said no one else had a right to use the mark in commerce. Was that a misrepresentation? No, Your Honor. Can you not have common law ownership of a mark? You can't have common law ownership of a mark. And did anyone other than the band ever use the mark Trick Pony? Not for those services that we're aware of. The reason why that representation was made at the time of the application was that the applicant was the individual, now an entity that was formed, believed that those rights were no longer valid, that the band had abandoned those rights based on multiple years of not performing. I thought they did perform periodically. In their brief, they assert they performed periodically even after they disbanded. Is that not accurate? I'm not aware that the band performed between 2008 and 2013. Did they not perform individually based on their Trick Pony relationship and fame? I don't know that the record has any indication of whether they performed individually. I thought the record indicated that they took on solo careers and continued to perform the songs that they had performed as Trick Pony. Am I wrong? Correct. Your Honor is correct. It does say that in 2009 they continued to perform separately and they performed Trick Pony songs as opposed to being a musical artist known as Trick Pony. If anybody would come to pay me, I could come and perform Beatles songs. Yes, but you would not have been the Beatle that originally signed them. Correct, but that doesn't give me rights. Performing songs that an artist has created doesn't give you trademark rights in that name. You have to perform as a band called Trick Pony to have rights for the services of being a band called Trick Pony. Just like you have to be the Beatles to have rights in the Beatles. You don't get those rights by performing Beatles songs. Can I ask you about the equities of this? It strikes me as patently unfair that the band built all the value in this mark and your guy was more sophisticated, for lack of a better word, than the band. They're just performing. They're trusting your guy. They go their separate ways for a little bit. Then they get back together, still trusting your guy. But in the meantime, it seems to me like your guy, who did nothing in essence to build this value, trolled and kind of co-opted it and then says, well, I want money for it. Because in his deposition, he essentially says, I want money. That's what he wants, right? Well, Your Honor, I don't think the equities are like that. Let me just start. The trademark cases are littered, if you guys have encountered them, with cases involving bands and rights. It's often the case that there's a lot of dispute among band members, managers, others, about who owns the rights. Here we have a case where a manager helped build a band. He wasn't a performer. He was a manager. But he was certainly a part of creating the fame of this group. Actually, they were pretty famous before he was hired. I mean, he was hired because they were becoming famous. And I guess my concern is what he wants out of this. I mean, he says he wants money. He's not going to establish another trick pony band, is he? Well, it's certainly possible that he can. One of the three original members. Well, yeah, maybe it is possible that he can, but that's not what he's going to do, is it? Well, it certainly is what he could do. I mean, at this point, he's not in a practical position to have another trick pony band because he can't enjoin the current trick pony band. His deposition said he wants money, right? Well, he wants an injunction. I mean, we're here for an injunction. We're not here for money. I understand. I'm asking him what he said in his deposition. Well, there's no deposition, but there's a declaration. Declaration. Yeah. I mean, the license agreement with the band provides for a royalty, to use the name. He did not choose to collect that while he was managing the band. He got paid as a manager. He didn't charge them or collect them for the use of the name. They fired him as a manager. Who came up with the name? The band, right? Not him. Correct. And so doesn't it strike you as odd that they come up with the name, they build the value in the name, and he's going to charge them to use their own name? Well, Your Honor, no, I don't. And the reason why I was starting to say, I mean, these cases are very common where rights are lost, are at issue, are challenged with bands. The Marshak v. Treadwell case that the plaintiff cites is about the drifters, right? The beginning of that case tells you that the manager in that case, Treadwell, in the 50s, forced the members of the band, the original and the second members of the band, to sign over the rights to the name as part of joining what was a band. The second members had joined after the first members were kicked out. It's not atypical that managers control certain rights. They might control publishing rights of copyrighted music, of names. The question here is what happened in this case. And it's my understanding that Mr. Graham said that he had merely acquired those rights to protect the brand since they were on hiatus or however you want to describe it. If that was what he wanted to do, why didn't he just do what had been done before and file the Section 8 affidavits? Why would he take them to himself as opposed to continuing the protection that was available? Well, I don't know that he was in a position to file the affidavits. The band was on hiatus. Well, if he was prepared to protect the brand, as he claims, then why would he not have let the band know that and simply ask for Section 8 affidavits again, which would do the very same thing but would protect it in the band's name? Well, Your Honor, I don't think that he was in a position to do that. He's not an attorney. He wasn't working with them at the time the Section 8 affidavits came due. What he did do was decide that there was a void, that perhaps these applications, registrations were at risk, so that he was going to file new applications. So without contacting them, to whom he had been a representative and perhaps owed a fiduciary duty, he took the rights to himself without notice. Isn't that what the record shows? The record shows that he filed trademark applications in his name. There's no indication that there was communication with the band at that time. The only thing he's done with the name is to facilitate the tour of the band under that name. This dispute isn't precipitated because he's tried to change the situation of him managing and representing the band and protecting the name. This suit is precipitated because they no longer want to work with him, but they want to use the name, right? So he's not done anything to try to create conflict or to exploit the name without them. Now, you know, there's three members of this group. They've operated in various permutations over the years. It's certainly possible that if this dispute can't resolve itself, if there's an injunction or resolution, a trial, that some other combination or others may be able to perform it. That happens all the time. What's the evidence of likelihood of confusion here? The evidence of likelihood of confusion, Your Honor, is that an authorized user is now unauthorized, and the public is now deceived as to the ability of the— The public always assumed that Trick Pony is this band. There's no one else performing as Trick Pony, right?  Can I ask you one other question, ma'am? Your client, as we talked about once, royalties. What's the irreparable injury then? Let's assume you're right on the merits. Why can't they just pay if they lose? This is consistent with your typical franchise licensing situation, right? Once you lack control, you are putting the reputation of the name of the band at risk. What you're asking us to find is the district court abused its discretion when your client said royalties would suffice in finding irreparable injury. We didn't say royalties would suffice. The deal seeks royalties, but all franchise licensing arrangements typically seek— If I'm a Burger King franchisee, you have to pay me to be— That's the reverse, right? You've built the brand value. Now you're going to Burger King and saying, I own Burger King. Now you pay me even though you built the entire value in it because— And you stop using your name, which seems— I mean, it just seems a little ridiculous, frankly. I would respectfully disagree, but if I could answer the question. I mean, I understand you have issues with the equities, but in terms of the issue of confusion, if I'm a brand owner, if I'm Burger King, if I'm Dunkin' Donuts, I'm a brand owner regardless of whether you think I should be or not. I have a reputation. I have control. I decide what kind of coffee you buy, what hours you stay open, how clean your restaurant is. I'm not saying that they're necessarily going to do anything, but where are they going to play? What songs are they going to play? How are they going to dress? What rehearsal are they going to do? What's flipped here is that'd be as if Trick Pony owned their own name, and you were trying to perform as Trick Pony. That's what you're saying, because Burger King owns their own name. It's not like someone's taken their name and now saying cease and desist using your own name. I understand what you're saying, but that—I mean, that—we—the court found we were the owners. Whether we should be the owners or not, the court found that we're the registered owners. Can I ask you about that? Because I actually saw that in your brief, and I think it's a legitimate point that the court said it, but an offhand comment without any analysis by the court, is that entitled to clear error review under our precedent? I believe it is, Your Honor. It's supported by the record. The record certainly could have found other facts, but the record found— Does there have to be analysis for us to give a clear error review or not? That's—my question is simple. Yeah, I'm not aware that you need to have underlying analysis as long as the record is supported by the facts, and I don't think there's any question. I mean, the registration under the statute is prima facie evidence of our ownership, our exclusive rights. One more question about that. How had Graham used the marks in commerce before he registered them? He used the marks in commerce via his arrangement with the band under license. So he himself had not engaged in any use of the brand independently of what the band did on behalf of itself? That's correct. That's all I needed to know. Thank you. The statute in Section 1055 of the Lanham Act, the Federal Trademark Statute, specifically provides that the first use or only use of a mark can be by a licensee, and that use counts as use by the applicant registering owner. So that, you know, the statute contemplates that owners will own rights that they don't use themselves, that they only use vis-a-vis licenses. That's Section 1055 of the statute. Thank you. Good morning, and may it please the Court. I'm Rob Peel, and with me is Jim Thomas. We're both from the law firm O'Neill in Harwell, Nashville. We represent the appellees TP2, Keith Burns, and Heidi Newfield, who were the parties that came up with the name Trick Pony and have been using it for nearly 20 years, and now their manager is telling them that they can't. This Court should affirm the decision of the District Court, as that Court did not abuse its discretion, which has been described as equitable or considerable discretion. And a preliminary injunction is an extraordinary remedy never granted as a right, and I disagree with opposing counsel. These are not common facts. These are extraordinary facts. Did the District Court find that Mr. Graham owned the mark? No, Your Honor. If you read the opinion closely, he uses the term Trick Pony Trademarks, capital T, as a defined term. Footnote 1 of the opinion defines Trick Pony Trademarks as the registrations. The registrations may be perhaps a prima facie evidence, but that can be rebutted. The common law ownership of the trademark, it's just the opinion is silent as to the common law rights. Of course they own the registrations. The man knew ultimately, found out that he had taken the registrations. But the registrations are not the underlying property. There's no property right merely in a registration. It's use in commerce and the goodwill and, you know, the lack of confusion. The order should be affirmed because, one, as a non-practicing entity, Graham has failed to demonstrate any likelihood of success in the merits. Two, if Graham was harmed, which of course we dispute, he has a remedy at law. And three, the public interest opposes granting an injunction to a non-practicing entity, especially in this context where you have a manager, a fiduciary who is abusing his principle. So as to the likelihood of success in the merit, the District Court properly determined that there's no possibility of confusion on these facts because there are no authorized uses. There are no other uses. There's no possibility of confusion, nor even any viable theory as to how there could be confusion. The only confusion you could imagine is if some fans bought tickets to a trick pony show and expected to see Heidi Newfield, Keith Burns, and then instead there's just three unknown people up there singing the songs that Heidi Newfield and Keith Burns made famous, songs they continue to perform and they continue to capitalize on the goodwill during that hiatus. So Graham's argument is a we-cheated-you-fair-and-square kind of argument. It's a hyper-technical, overly-legalistic argument, and it relies exclusively on the alleged licenses. The position, as I understand it, is if you merely allege the existence, if you invoke a license, that you win. Because an alleged licensure is entitled to an injunction, apparently as a matter of law, and the licensee, and even non-signatories to any license. Because remember, Heidi Newfield and Keith Burns never signed any license in their individual capacity to the extent these licenses ever were valid and not forgeries. So this per se rule would apply under this line of questioning, even if there's a question of fact, as the authenticity. It applies if the licensor does not own the mark and has never made a bona fide use of the mark. It would apply even if the license was a product of fraudulent inducement, even if it's a product of flagrant self-dealing by a fiduciary, even if one of three defendants was even a party to the license, even if there's zero evidence of any customer confusion or no possibility, no viable theory of how anyone could be confused in this instance. So the position is that if you just invoke a license, you're entitled to extraordinary relief, and the only role of the district court in this instance would be to just grant the application with a rubber stamp. So if you have the license, according to this theory, you have automatic confusion, which then means you have automatic irreparable harm. And, of course, because likelihood of success of the merits may be reviewed de novo by this court, what PGP is actually asking you to do is to take away the discretion that district courts have historically enjoyed for as long as there have been courts of equity over in this injunctive context. And that can't be the law. The district court, in its opinion, it cites the Ebay case, the Supreme Court Ebay case, where the majority opinion very expressly disavowed such a mechanical application of injunctive relief in the patent context. And that decision also points out that it's done so in the copyright context. This circuit has not yet taken up that issue in the trademark context, but the 1st, 3rd, 4th, 5th, 9th, and 11th circuits have applied Ebay to trademark cases. And to be clear, we've found no circuits that have rejected the application, just many have not reached it. We respectfully submit that this circuit should join that list and reaffirm that in the trademark context, judges still have the discretion, still have to go through the four factors and balance them, and the cases mean what they say. As to licenses themselves, as we explain in our brief, there's a host of reasons why they are not dispositive. First, there's good reason to believe they're forgeries. But I don't want to get bogged down in that because even if they're- How do you respond to your opponent's argument that we can't consider the ban's prior use based on the license merger rule? Yes, Your Honor, the license merger rule. First and foremost, they can't get around the fact that Burns and Newfield never signed the licenses. They never signed the licenses. So PGP Graham has chosen to sue TP2, the entity, and then also Ms. Newfield and Mr. Burns, Ms. Newfield and Mr. Burns in their individual capacity. And when they try to defend themselves by showing that there's fraudulent procurement, he asserts the merger rule as a sword and not a shield, and there's no support for that in the case law. We can find no cases where there's been such application going to the members of an entity like this. Further, this is not the kind of cases in which the merger doctrine is applied, and it's been applied somewhat haphazardly. This is not where there's a local affiliate who's broken off from a national affiliate. This is not where there's a case where there's two competing users or one has at some point recognized the other's superior use. There's no competing use. There's no unauthorized or there's no authorized use. How do you deal with this argument? So I understand that about the competing use. But one of the arguments is, look, it's ridiculous that Burger King couldn't stop someone from calling themselves Burger King. That is, they own it, they own the trademark, and someone else wants to call themselves the potential for confusion and the potential for irreparable harm is there if someone opens a restaurant called Burger King that doesn't produce the quality products that Burger King produces. Absolutely, Your Honor. That's right. And the difference in this case is that the band, they came up with this name. They created the goodwill. They have been the ones performing. They've controlled the quality of the goods and services and the mark. Newfield left, right? Or was she back? She left. She did leave the band, Your Honor. So could there be an argument that if two of them were performing instead of three, or was it all three? I'm sorry. At first it was three, and then it went to two, went back to three, and then to two again. Right, so it's now at two. Yes, Your Honor. So could there be an argument that it's essentially Van Hagar instead of Van Halen? You could make that argument, Your Honor, but the evidence is what's the public thinking. What's in the public's eye who is Trick Pony? And if you look even at Graham's submissions, even at the manager's submissions, what did he submit? He submitted album covers, and who's on it? It's Heidi Newfield. She's the one who's had the biggest hits. She's the one that's singing the songs. And Keith Burns, who is my client, has never left the band. He's continuously been a member of Trick Pony from 1996 until the present. I guess my point is if Trick Pony is the brand, and the brand assumes that Miss Newfield is a part of it, then are you diluting it by not having her, and could he be protecting that? Does that make sense? Does my question make sense? Yes, Your Honor. I understand the question. I guess given that all he wants, and as was stated in argument on this very motion, all he wants is a new license. That does nothing for the brand. It's transparent to the public whether or not someone is licensing this thing out. And as we mentioned in our brief, if there's any harm that he's suffering from this, it's surely easily calculated as a percentage, assuming he were to be victorious below. I'd also like to touch briefly on the fraudulent procurement. Before you do that, could you answer one other question we asked your opponent? I think it's 2008 and 2013 are those the years. Did they perform at all as Trick Pony? Yes, Your Honor. Well, they did once, but it's a very significant date. So when they go on a hiatus, they embark on these solo careers. And there's evidence in the record that as they're embarking on their solo careers, as anyone would, they play Trick Pony songs at concerts. They make sure to mention how they're a part of Trick Pony. They formerly helped Trick Pony, things like this. They're using, they're capitalizing on the goodwill. And throughout that period, albums are being sold. As a matter of fact, during the hiatus, Warner Brothers releases a best-of Trick Pony album. While they're broken up, and that album cover contains the likenesses of Heidi Newfield and Keith Burns. But this shortly before, sometime during the hiatus, it was actually in July of 2008. After the band had separated, Graham, well, to back up, the attorney who filed the applications for the band was one that was arranged by their manager, Mr. Graham. Go to their manager and say, this is one of the things we need to do. He arranges and gets Gunley & Cave, this law firm, to file these trademarks and service marks for the band. The band breaks up. During the hiatus, Gunley & Cave, same law firm, files the Certificate of Inconsistency and Use on the service mark. Okay? During the hiatus. And remember, this is the same law firm that goes and procures these marks for Mr. Graham. And the band starts talking. They decide to get together. They get together in July of 2013. In July of 2013, they perform as a concert-as-trick pony. They're reunited. They're excited. They call their manager. They say, Mr. Graham, we're back. We want you to manage us once again. So what's he do? Subsequent to this, subsequent to this, he files, number one, he'd already applied for the trademark. But he applies for, he files the Certificate of Use and Incontestability on the trademark after he's been told about this performance. And then he actually files his application, his application for the service mark. Remember, the service mark is for live musical performances. After he's been told there's a live musical performance that just happened, we're back. And in that application, he says, no one else has the right to use this. There's no other explanation for that other than what he wanted to do was grab these licenses and hold them over and have some sort of control over the band. What about your opponent's argument that this happens all the time? Your Honor, the only case we can find that was remotely similar was the Crystal Entertainment 11th Circuit case, the expose case. And in short, the court made short work of that, and they said, well, you know, there were licenses in that case. There was an abusive manager, and the court decided that the product denoted by the mark is, in fact, the members of the band. And the same is true here. They own the common law rights, and there's not a colorable argument that they don't otherwise. As to the public interest, the district court did not abuse discretion when it determined that the public interest disfavors granting injunctive relief to non-practicing entities who are just seeking leverage in licensing negotiations. And he cited Justice Kennedy's concurrence for that, and that's right. But setting that aside, the public interest disfavors rewarding the manager in this instance. He's an abusive fiduciary who's just attempting to sell back to the band what he got fraudulently and what they already own. So if nothing else, this is an equitable matter, and it is subject to equitable defenses, particularly the unclean hands defense. Now, PGP claimed this defense is invalid, claiming that the defendants had unclean hands because of their, quote, infringement vitiates the defense of unclean hands. Why would Congress specifically enumerate unclean hands as a defense to infringement? We respectfully submit the better position is that an alleged infringer can assert unclean hands as an affirmative defense, as a common law sense of the statute would indicate. Grimm also claims that this defense is foreclosed by delay. But as this court pointed out in the Yellow Book case, unclean hands is an equitable principle, and it can only be used defensively against a specific party, and that's what happened here. When they were sued, they asserted unclean hands as a defense per Section B9. So in conclusion, Your Honor, I come back to the city of Mansfield case where this court held that the district court's weighing and balancing of the equities should be disturbed on appeal only in the rarest of circumstances. Given the peculiar facts of this case, this is not one of those circumstances. The district court did not abuse its discretion in weighing and balancing the equitable preliminary injunction factors and finding the plaintiff had failed to meet its burden, and we respectfully submit the decision should be affirmed. Thank you. I'd like to go back to the basis of the decision of the standard of review, and I appreciate Your Honors have expressed certain skepticism about the equities of the case. But we're here on review of a district court decision, and the district court found that we're the registered owner of the mark, and the district court found that the defendants had entered into three license agreements. Those license agreements explicitly disclaim any ability to challenge the validity of that mark. There's other equitable... Did they not challenge that those were procured by fraud? Your Honor, they argued that below, and that was not found by the district court, and we do not believe that they were procured by fraud. The district court did not find that there was no fraud in the procurement, right? That issue was left unresolved. Well, I don't know that it was left unresolved. It was argued. It was advocated, and the court's findings of fact do not support that. The court found valid licenses. So the court doesn't have a sentence that says, I find it wasn't fraud. But if you make an argument below and you don't make a finding supporting that argument, that argument is rejected. I mean, it was available. The court decides on another basis. Correct. The court made a decision on a legal basis, right, that in order... If you're an exclusive licensee, right, that means that the plaintiff can't use the mark. In an exclusive license, right, even the owner can't use the mark, right? It's only this one licensee, and that's the way the world works in a lot of industries, right, where you economically, if you're going to enter into a license, you're going to invest in capital, build a business. You don't want to be competing against somebody else undercutting you, right? So it's very common to have exclusive licenses. The Blue Cross Blue Shield case that they cite, we cite, those are insurance arrangements that are, I think, whole state or partial state, right? So there's only one Blue Cross in Ohio, maybe another one in Kentucky. So basically what they're saying is if you're an exclusive licensee, you have less protection than if you're a non-exclusive licensee, because in a non-exclusive arrangement, I can compete with you. I can have multiple users out there. In an exclusive licensing arrangement, if there's a violation of the license, until I can persuade somebody to invest capital, take on the risk and whatever of going into the marketplace, I can't stop the other user, right? That's never been the law. And that's why the law, in fact, is that when you have a licensing arrangement and the license ends for the reasons that Your Honor had suggested, you almost per se have an issue of confusion. I appreciate that you think there are reasons why the plaintiff here shouldn't be the owner of the mark, but the point is that the court found that we are. So if we're the registered owner of a mark where somebody enjoyed the benefit of a license,  where the merger rule says when you get license agreements, that quiets title as to everything that happens before the license. That's the way we want licensing arrangements to work. We don't want to be looking back. We want to be looking forward after a license agreement, right? Under those circumstances, the law does not support creating this direct competition requirement. I'll point out, you know, I mentioned the Lanham Act about exclusive licensees being users. I mentioned the Lanham Act about the exclusive right to use the mark. 1125, 15 U.S.C. 1125, which is the infringement section, talks about confusion as to affiliation, connection, or association with another person as to origin, sponsorship, or approval. Those are the direct issues that are at play in a licensing arrangement, right? As you said, everybody thinks a Burger King is controlled by Burger King. Here, people may not know that Trick Pony is controlled by another entity, but they certainly understand that Trick Pony is subject to a certain service, a certain entity. And without that control, the trademark owner is at risk for losing the equity, the value, the goodwill. There's no reason to believe that they're going to do this, but without that ability to control it, there's irreparable harm. My time is up. Thank you very much for your time. The case will be taken under advisement. Thank you for your arguments.